## Bell *versus* The Ohio and Penna. R. R. Co.

DISSENTING OPINION BY BLACK, C. J., WITH WHOM KNOX, J., CONCURRED.

1. A right of common is an estate which the owner may convey or dispose of by his will, and if he dies without doing either, it will descend to his heirs.

2. The interest of the complainant in the common of Allegheny city is private property.

3. Under the constitution of this State, private property cannot be taken for public use without *just compensation*. This restriction covers all kinds of property, personal and real, corporeal and incorporeal.

4. Only commoners have a beneficial estate in the Allegheny common, and they cannot be deprived of it without a compensation which will fully pay them for all the injury, direct and incidental, which they must suffer.

5. The city of Allegheny, in its corporate capacity, has no interest in the common; neither have a majority of those who elect her officers.

6. The right of eminent domain, delegated to a corporation, can never be exercised without a strict and full compliance with all the provisions intended to secure compensation to the owners.

7. The corporate authorities of the city of Allegheny have no authority to confer upon respondents the private interests of the commoners in the Allegheny commons.

8. An equitable estoppel cannot be created by silence, which concedes nothing and deceives nobody.

9. The city of Allegheny accepted the common for the use of the lot-holders, and put herself under a clear, legal and equitable obligation never to deprive them or their heirs of its use, without their consent in writing.

IN EQUITY.—Appeal from the decree of the District Court of *Allegheny county*, refusing an injunction to restrain respondents from using the Allegheny commons for the purposes of their railroad.

Mr. Justice LOWRIE did not sit in the case.

LEWIS, J., and WOODWARD, J., concurred in refusing the injunction, and BLACK, C. J., and KNOX, J., concurred in the opinion that the injunction should be granted.

The court being equally divided, the result is that the decree of the District Court is affirmed.

The facts of the case, together with the opinion of Mr. Justice LEWIS, concurred in by Mr. Justice WOODWARD, may be found in 1 Casey's Reports, 161.

[Bell *v.* The Ohio and Penna. R. R. Co.]

The following opinion was delivered January 10, 1855, by

BLACK, C. J.—The defendants have laid their railroad along and across what is called the Allegheny common, and occupy for that purpose a piece of the common fifty feet wide, upon the south side of it. They have also taken another portion of the common, at the terminus of the railroad, on which they have erected a stone wall and a platform, for the receipt and delivery of freight and passengers. They deny any present intention to take still more of the common, as the bill charges, for station-houses, &c., but say that the design to do so has been suspended.

The common consists of one hundred acres, around and adjoining the old town of Allegheny, as laid out by the State in 1787, and reserved forever to the use of the inhabitants for a common pasture. The right of common was sold with, and is appurtenant to, the lots. The plaintiff is the owner of a lot on the edge of the common, and very near to the railroad terminus. He complains of the defendants' acts and doings, in appropriating these portions of the common ground to their use, as being without authority of law and a grievous injury to him, not only because he and the other lot-holders will be deprived of so much pasture-ground, but for the further reason that a space will be closed up which he had a right to keep open, and the defendants, with their trade, will create an intolerable nuisance in close proximity to his dwelling, by which the value of his property will be much reduced. He therefore prays for an injunction.

The questions raised and discussed here, as well as in the court below, may be thus enumerated:

1. Supposing the act of the defendants, in appropriating the ground in question, to be unlawful, has the plaintiff such an interest in it as will enable him to sustain this bill?

2. If he had such interest, did the defendants take the land in the lawful exercise of their corporate privileges?

3. Assuming that both these questions may be answered in the plaintiff's favor, did he or did he not forfeit his right to the relief which this bill prays for by his own acts or omissions at the time of the taking and afterwards?

1. It is not denied that the plaintiff's interest in the common is private property. A right of common is an estate, which the owner may convey or dispose of by his will, and if he dies without doing either, it will descend to his heirs. In the present case, moreover, the plaintiff has paid for the right, and is entitled to enjoy it, not only by the common law of the land, but by two several statutes, which have been passed on purpose to guard it from invasion. Under the constitution of this State, private property cannot be taken for public use without *just compensation.* This covers all kinds of property, personal and real, corporeal and incorporeal. It is as comprehensive as the tenth

[Bell *v.* The Ohio and Penna. R. R. Co.]

commandment. You shall not take from a citizen "anything that is his" without a full and fair equivalent.

The land taken by the defendants is of great value to *them.* It lies in the heart of a large and thriving city, where every foot is precious. Its value to the plaintiff may be measured by the outside demand for it as well as by the profit which it yields to himself. One who has the control of property for his own use, may retain his dominion over it until the competition among those who want it shall raise it to its highest price, and it matters not that the proprietor's use is so limited by circumstances or by the law, that he can make but a small profit out of it. If he chooses to keep it, even at a loss, that is his own affair. The actual value of this ground is, perhaps, a thousand fold greater than it was fifty years ago. Who is entitled to the benefit of this appreciation? Nobody but the commoners, for it was reserved for their use alone. They, and they only, have a beneficial estate in it, and they cannot be deprived of it without their consent. He who desires to get that consent, ought to pay a consideration, measured at least, in some degree, by the value of other land similarly situated.

But this common is valuable to the owners of it themselves. No one who has ever lived in a populous town will deny the usefulness of large open spaces, filled with air and light. Those who reside on the edge of such a place are especially fortunate; for their comforts are greater, their prospect pleasanter, and their health more secure. Its prospective usefulness to them may be still greater. The law enables them to convert it into a park or such other public purpose as the city authorities may devote it to with their consent. Even without an ordinance, there is nothing to prevent them from enclosing and planting it whenever they see proper. If these commoners, or any one of them, after buying their lots, building and improving, with reference to these advantages, and on the faith of a solemn law, which secured them forever, can now be deprived of them without a compensation which will fully pay them for all the injury, direct and incidental, which they must suffer, then their case is as hard a one as any court of justice ever had to deal with.

But the counsel for the defendants and the judge of the District Court seemed to think that all this property, so valuable to both parties, may be transferred from one to the other without any compensation to the injured party, except for the loss of the pasture, and as the common has produced very little grass for some years past, and that little must be divided among many, the plaintiff's right in the land is inappreciable or unworthy of notice, and so the railroad company may just take it for nothing. It is thus, that by a "thorough knowledge of decimal fractions," the plaintiff would be ciphered out of an estate which no prudent

[Bell *v.* The Ohio and Penna. R. R. Co.]

man that has it would sell for thousands, and no fair man that wants it would expect to get by contract, for anything less.

Where shall this end? If we concede the law on this point to be with the defendants, what protection is left to the owners of the property? If the defendants may have a piece of it for the taking, what shall prevent them, or any other company or person, from taking all the rest of it on the same easy and convenient terms? A railroad company, acting outside of its charter, is not stronger in law than an individual; and without the right of eminent domain, property cannot be taken for public any more than for private use. If, therefore, some enterprising iron master should think fit to build a furnace or a rolling-mill at the plaintiff's door, fronting on the common, he has nothing to do in the way of payment for the ground, on the principle contended for, except to take out his slate, calculate the quantity of grass that grew on the ground, divide the sum of it by the number of commoners' cows, and if his arithmetic brings out an inappreciable quotient, the controversy is settled forever. *Equity* will give the injured party no relief, and *de minimis non curat lex.* We cannot sanction this doctrine, without leaving the whole Allegheny common—a hundred acres of the most valuable land in the State—open to the first comer who has boldness enough to set himself down on it.

If we do not listen to the complaint of the lot-holders, it is not likely that any other will ever be made. The city as trustee for the commoners, might, perhaps, sustain an action, or bring a bill against an intruder ; but it must be remembered, that the city in its corporate capacity has no actual interest in the common, and neither have a majority of those who elect her officers. The history of this case shows plainly enough, that the inclinations if not the interests of the councils, may be opposed to the rights of the lot-holders in the old town. If we would dismiss this bill on the ground, that the plaintiff has no interest, which entitles him to be heard, what would we do with a bill brought by a party who has no interest at all ? There is no escape from the conclusion that we must allow this party to vindicate his own rights, or else decide that there is no vindication for them. We are, therefore, bound to inquire whether the defendants took the ground in question, lawfully or unlawfully.

2. I have said that this is private property. It may, therefore, be taken for public use. But to make such taking lawful and constitutional, without the consent of the owner, it must be done under the express authority of the State, and with compensation paid or secured.

The defendants were incorporated by the State of Ohio. Their rights and duties are defined by the general railroad law of that State. The legislature of Pennsylvania adopted the Ohio charter,

[Bell *v.* The Ohio and Penna. R. R. Co.]

and gave the company precisely the same privileges here as there. The 9th section of the law of Ohio delegates to railroad companies, the right of eminent domain as far as may be necessary in the construction of their respective works. But the manner in which the power shall be exercised is distinctly pointed out. A description of the right and interests in land intended to be taken, must be filed in some court of record of the county where the land lies, and payment must be made, or security given before it can be taken. There is no pretence that any description was ever filed—that payment was ever made or secured—that the price was agreed on between the parties, or that any opportunity was given the plaintiff, to have it fixed by appraisement. It is unnecessary to say that the right of eminent domain when delegated to a corporation, can never be exercised without a strict and full compliance with all the provisions intended to secure compensation to the owners. The taking, therefore, is not justified or excused on that ground.

The answer avers that the defendants, in taking the land, acted under the authority of the city corporation; and it is true that the city councils passed an ordinance, granting the right of way over the common. But had the councils any authority to take the plaintiff's private property from him, and give it to the railroad company? If they had, they must have derived it from one of two sources—either from the defendants' charter, or from the laws which have been made with special reference to this property.

The 11th section of the Ohio railroad law, which forms part of the charter, declares that if it shall become necessary to lay a railroad on *any road, street, alley, or public highway, or ground,* the public authorities *owning,* or *having charge* thereof, may agree upon the terms, &c. The meaning of this can scarcely be mistaken. It was manifestly intended to regulate the location of railroads on ground in which nobody but the public had any interest. When no private rights are to be affected, it is proper that a company should treat with the officers who represent the community. But this is not a road, a street, an alley, or a highway. It is ground, but though it be *common* to a certain number of persons, it is not *public* in any true sense of the word. Neither is it owned by, nor in charge of the city councils.

The city corporation is the depository of the legal title in the soil, but has no power to regulate its use or exercise any actual control over it, without the consent of the lot-holders. We cannot believe that the legislature, either of Ohio or Pennsylvania, meant by this section, to make the authorities of a city, borough, or township, the instruments in the hands of a railroad company, for depriving citizens of their rights without compensation. If they

[Bell *v.* The Ohio and Penna. R. R. Co.]

did, the law is unconstitutional and void, at least on this side of the state line.

Let us consider the other ground upon which the same power is claimed for the councils. The town of Allegheny was laid out in 1787, on land which belonged to the State. The one hundred acres which now constitute the common was laid out at the same time; the legislature declaring that it should be reserved to the lot-holders forever as a common pasture. Every person who bought a lot, bought with it an interest in the common, and paid for both at the same time. The State did not then part with her right of property in the soil, but she devoted it exclusively and irrevocably to the use of the lot-holders of the town. In 1840, an Act of Assembly was passed, vesting the title of the State in the city, with an express provision that it should never be converted to any use other than that mentioned in the Act of 1787, unless releases should be first had from the commoners. Yet the councils presumed to give it to the defendants for the purpose of a railroad, without getting releases from, or asking the leave of the commoners. Of course their act was a mere nullity. They had no more right to take the common in this way than they had to take the lots to which the right of common was appurtenant. The ordinance was not only without legal authority to support it, but in the very teeth of a positive prohibition.

It is argued, however, that the common having been left open for more than twenty-one years, and used all that time as a mere highway, on which every one who pleased was permitted to travel, the right of the plaintiff and other lot-holders to reclaim it now for its proper purpose is gone. But where is it gone? If the plaintiff has not a right in it who has ? Not the Commonwealth, for she recognized the interest of the lot-holders so late as 1840, and then passed a law to secure it. Not the city, for she accepted the Act of 1840, as a part of her charter, and came under an implied obligation never to do anything which would deprive the commoners of their rights, without their written consent in the shape of releases. Individuals who may have happened to drive a cart across it certainly did not acquire title to it by that means. And surely the right has not escaped to the clouds, or vanished into thin air, leaving the land without an owner that can use it, to be taken up by the first finder like a waif or a stray. None of these theories can have any legal foundation. The right of commoners is as good as it ever was, for the plain reason that there is nobody on the earth in a condition to dispute it with them.

3. The strength of the argument was perhaps expended on the third point; namely, that the plaintiff *acquiesced* in the appropriation of the land by the defendants, and therefore, if he has not lost his remedy at law, he has at least forfeited his right to the relief which a court of chancery might otherwise have afforded

him.  The acquiescence charged against him consists simply in silence.  He saw the work going on, and he did not remonstrate. It is not proved, and on'the argument it was not asserted by counsel, that he misled the defendants, or that they were acting under any mistake which he could have corrected.

Undoubtedly a man may lose his right of redress by mere submission to an injury, if he submits too long.  The Statutes of Limitation prescribe the time within which actions at law must be brought, and a claim old enough to be barred at law will not be listened to in equity.  But here the plaintiff's right is not affected by time.  His acquiescence is set up against him by way of equitable estoppel.

. If one who has title to land actively induces another to expend money or labor in improving it, he shall not afterwards be permitted to claim it against such improver, because that would be a gross and mischievous fraud.  For the same reason, if I see a person purchasing my land from another whom he supposes to be the owner of it, or making improvements on it under a mistaken belief that it is his, I am bound in common honesty to correct his error as soon as I can, and if I omit to do so I am estopped from setting up my title against him.  But never since the beginning of the world has it been held that an equitable estoppel can be created by simple silence, which conceals nothing and deceives nobody.  A wanton aggression by one person upon the known rights of another, is not sanctified nor made innocent by the mere fact, that the sufferer did not cry out on the instant, and threaten the wrong doer with punishment.  He may bide his time and demand redress at his leisure, provided he does not wait until he is barred by the statute.

Here was no fraud on the part of the plaintiff, nor no mistake on the part of the defendants—no concealment on one side, nor erroneous opinion of title on the other—as there was in every case cited at bar.  The eyes of both parties were equally wide open.  The plaintiff could not have told the defendants anything about their title or his own, which they did not know as perfectly as he did.  To give them information on the subject was impossible; to tell them what they knew already, would have been the emptiest vanity; and it is a maxim of universal application, that " *lex neminem cogit ad vana seu impossibilia.*"

The acquiescence spoken of applies only to the strip fifty feet in width, used by the defendants as a road way.  Against the taking of other portions for other purposes, the plaintiff protested at the earliest moment.  Neither does the city ordinance grant more than the right of way.  For going beyond these fifty feet, there is not only no legal justification, but no shadow of moral excuse.

If we acknowledge these rights of the plaintiff, I think it is

[Bell *v.* The Ohio and Penna. R. R. Co.]

our imperative duty, now and here, to restore him to their full enjoyment. Injunction is the very remedy for abuse of power by a railway company; the only one that can keep a corporation within the line of its duty, and make the property of the people secure against this sort of invasion. If we remit the case to a common law tribunal, we bid the defendants to live on forever in the daily violation of the constitution as well as the law, for no common law judge can enforce specific obedience to either. The plaintiff has not only no adequate remedy at law, but it is more than doubtful if he has any remedy at all. Can he recover for his loss in assumpsit? There was no promise, express or implied, to pay him. Trespass? He has no property in the soil. May an action on the case be brought for disturbing his right of common? Perhaps so; but then the doctrine that he is entitled to recover for nothing but the grass, might be applied with some show of reason. Besides, it is not at all clear that any action at law would not be defeated, by showing that the property was taken for public use, and the mode of adjusting the owner's compensation is fixed by a statute which makes that mode exclusive.

This disposes of every point of defence made by the railroad company, and if it be true, it carries away the whole foundation of the decree made by the District Court.

But very recently, and long since the argument, a point not thought of by the able and learned counsel for the defendants has been suggested here. It is this: that, by certain ancient decisions in England, the principle is established there, that when a commoner buys a part of the land in which he has a right of common, such right of common is extinguished. This, it is said, will apply to the present case, because, upwards of forty years ago, the predecessors of the present lot-holders agreed that Water street should be widened twenty feet, and they indemnified themselves for the loss of the ground thus devoted to public use, by moving the south line of their lots twenty feet in upon the common. For myself and one of my brethren, we reject this view entirely, and for many reasons. No such thing as a *purchase* is proved. No deed is produced. No parol bargain is shown. The State was the only person with whom they could have made a contract at that time, and there does not appear a trace of it on her records. A witness merely mentions, as a fact which dimly abides in his recollection, upwards of forty years ago Water street was widened, and the lots moved twenty feet further on the common. Surely something more than this ought to be produced to take away the plaintiff's right, on the score of forfeiture. If anything is well settled, it is that courts should require strict proof of a fact on which an innocent man, who has paid a fair price for his property, is to be deprived of it, because some other person, with

[Bell v. The Ohio and Penna. R. R. Co.]

whom he is privy in blood or estate, committed a wrong at a remote period, perhaps before the person who is now called on to suffer for it was born.    But again : if the act on which the alleged forfeiture is based were clearly proved as a matter of fact, and indubitably established as being sufficient in law for the purpose, the forfeiture has been remitted.    The several Acts of Assembly on the subject of this property are all inconsistent with the notion that the plaintiff, or any other person in like relation to the matter, was to be affected in this way.    The State held the land for their use—vested it for their use in the city corporation, and carefully guarded it for their use by repeated legislation.    The city accepted it to hold for the use of the lot-holders, and put herself under a clear legal and equitable obligation never to deprive them or their heirs of its use, without their consent in writing.    The right thus guarded was a right of all the in-lot-holders, without exception.    Yet, after these solemn pledges by the State and the city, the lot-holders are now to be told that if a single witness can be found whose memory or imagination is strong enough to fish up from the oblivion of forty years some act of that generation which this one cannot explain, such plunder as that which this bill complains of may be perpetrated with impunity.    But that is not all.    The point I am now discussing does not arise in the case at all.    The answer does not put the defence on any such ground.    The word forfeiture is not mentioned, (nor purchase either,) with any reference to this subject.    All the pleadings, and the whole course of the argument, show that the ground on which the injunction is here to be refused, never entered the minds of either party, or the counsel on either side, or the judges of the District Court.    It will strike them with surprise, not to say astonishment.    I have the utmost respect for those who think (as I do not think) that judicial ingenuity is well expended in raising technical points to defeat the rights of suitors, when the suitors themselves, on both sides, are willing to be tried on the merits of their case.    I think the domain of the law is full enough of man-traps and spring-guns, without any assistance from me in setting them.    How much injustice may be done by this one it is impossible to calculate.    The witness who spoke of Water alley, and the change of boundary, did so in a merely incidental way.    It is perfectly fair to suppose that if it had been a part of the issue, this old transaction, remote as it is, could have been thoroughly explained.    At all events, it seems to me certain that an argument on it would have satisfied every judge in the court that it could not be taken advantage of by the commonwealth or the city, after the Act of 1840—and several of our recent and unanimous decisions might have been cited, that no man is or can be called on to clear his title from

an imputation upon it arising out of a fact more than twenty-one years old.

I am, therefore, in favor of the injunction.

Mr. Justice KNOX concurred.